**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MELISSA JAY CRAIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-CV-7758 |
| | ) | |
| COLUMBIA COLLEGE CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment brought by Defendant Columbia College Chicago ("Columbia"). This matter arises from the Columbia's employment of Plaintiff, Melissa Jay Craig. In her complaint, Craig alleges that Columbia discriminated against her in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Specifically, Craig alleges that Columbia discriminated against her on the basis of her disability, a hearing disorder, by (1) failing to select her for a tenure-track position, (2) terminating her employment, and (3) failing to provide her with reasonable accommodations. Columbia filed an answer denying all allegations of fault and now seeks summary judgment on all issues. For the reasons set forth below, we grant the motion in its entirety.

**II. BACKGROUND**

Craig began her employment at Columbia in 1994. (Def. 56.1 Stat. ¶ 1.) She has a bachelor's and master's degree in fine arts from the Art Institute of Chicago. She started

1

teaching in Columbia's Interdisciplinary Arts Department ("Department") in 1996, began

working as a full-time non-tenure track faculty member in 2001, and had worked exclusively in

the Department teaching graduate level and thesis courses and supervising graduate students on

independent studies since 2005.  (*Id.* ¶¶ 2–3; Pl. 56.1 Stat. ¶ 2–3.)  She received awards,

including the all-college Excellence in Teaching Award for full-time faculty in 2002, an

Excellence in Teaching Fellowship from 2002–2004, and the Columbia College Chicago Faculty

Development Grant in 2008.  (Pl. 56.1 Stat. ¶ 4.)

     Craig also suffers from a degenerative hearing loss in both ears, which causes her

difficulty hearing.  Even with a hearing aid, she relies on reading lips and body language to

communicate.  Her hearing loss significantly interferes with her ability to communicate by

telephone and understand dialogue in group settings.  (*Id.* ¶ 1.)

## I. The Tenure Track Position

     In 2007, the Department posted an invitation for applications for a new tenure-track

position.  (Def. 56.1 Stat. ¶ 10.)  The search committee for the new hire included Michelle

Citron, the Chair of the Department, Jeff Abell and Clifton Meador, tenured faculties members,

and Arti Sandhu, a member of the Art & Design Department.  (*Id.* ¶ 14.)  Citron, as one of the

people who drafted the job description, explained that they placed direction of the Department's

papermaking studio as the first responsibility in the description to alert applicants that it was

considered to be a critical aspect of the new job.  (*Id.* ¶¶ 11–13.)  Craig and another former

faculty member assert that Meador told Craig and others that the position was "written for her."

(Pl. 56.1 Stat. ¶ 23.)  However, Meador testified that he never made such a comment.  (Def.

Resp. to Pl. 56.1 Stat. ¶ 23.)[1]

Craig applied for the position, and both parties agree that she was qualified for it.  (Pl. 56.1 Stat. ¶ 22.)  When Craig interviewed for the position, she informed the committee that she had difficulty communicating by telephone and was given an in-person interview.  (Def. 56.1 Stat. ¶ 15.)  After becoming one of the final two applicants, Craig participated in on-campus interviews and gave a public presentation.  (*Id.* ¶¶ 16, 18.)  Columbia asserts that each applicant was asked the same questions during the interview.  (Pl. Resp. to Def. 56.1 Stat. ¶ 20.)  Craig, however, explains that her interview also included questions regarding Craig's use of email to communicate.  (Pl. 56.1 Stat. ¶ 24.)  The other final candidate was Melissa Potter.  Potter had previously worked at Dieu Donne, a premier papermaking studio in New York city, had received two Fulbright Scholarships, had built a papermaking studio in Serbia, and had overseen its operations while teaching students there.  (Def. 56.1 Stat. ¶¶ 22–23.)

After the interviews and presentations, the Dean asked the search committee for their opinion of the two candidates based on the criteria set forth for the job.  (Def. 56.1 Stat. ¶ 32.) The committee composed a memorandum promoting both Craig and Potter as recommended candidates.  (Def. 56.1 Stat. ¶ 31.)  While the formal communication did not include ranking, Citron recommended Potter for the position in a private conversation and articulated his belief that Potter would better incorporate theory into the Department.[2]  (Pl. 56.1 Stat. ¶ 25; Def. 56.1

---

[1] In fact, Meador also testified that he did not recommend Craig for the job.  (Def. 56.1 Stat. Ex. G (Dep. of Meador) at 209.)

[2] In 2006, an outside evaluator had conducted a program review of the Department and recommended that it change the curriculum's focus to stress more theory and concept.  (Def. 56.1 Stat. ¶¶ 4–5.)  The Department followed this recommendation.  (*Id.* ¶ 6.)

3

Stat. ¶ 38.) Then, upon the recommendation of the Dean and with the approval of the Provost,
the tenure-track position was offered to Potter in April 2008. (Def. 56.1 Stat. ¶ 40.)

Citron explained that Craig did not receive the offer partially because the committee
members faulted Craig for failing to discuss the relationship between theory and practice during
her public presentation or to address it satisfactorily during her interview. (*Id.* ¶ 24.) In fact,
Citron believed that Craig felt the department was becoming too conceptually based. (*Id.* ¶ 7.)
In support of this belief, Columbia offers Abell's testimony stating that Craig commented during
faculty meetings attended by Citron that the changes toward a theory-focused curriculum would
undervalue what the school had accomplished in the past. (*Id.* ¶¶ 7–8.) Craig denies that she
made these statements. (Pl. Resp. to Def. 56.1 Stat. ¶¶ 8–9.) She asserts that she never
expressed hostility to a theoretical approach and advocated for inclusion of all approaches to
artwork. (Pl. 56.1 Stat. ¶ 20.) There is additional evidence, presented in the form of Abell's
testimony, that Potter's and Craig's public lectures were in direct contrast on the issue of theory.
Specifically, Abell believed that Craig did not consider theory to be worthwhile, while Potter
discussed her engagement with current ideas and writing and thinking on the topic. (Def. 56.1
Stat. ¶¶ 25–27.)

Craig responds by explaining that theory was not a required part of the presentation. (Pl.
Resp. to Def. 56.1 Stat. ¶ 26.) She further argues that she did address the conceptual
development of her work in her presentation and that the committee should have been able to
consider other evidence of her approach to theory from her time teaching at Columbia. (*Id.*
¶ 24.) After the Fellowship, Craig asserts, and Columbia denies, that she incorporated
theoretical approaches into her art practice and teaching. (Pl. 56.1 Stat. ¶ 5; Def. Resp. to Pl.

4

56.1 Stat. ¶ 5.) Both parties agree that after the Fellowship, she created a course called the

Teaching Artist, in which she presented some of the theory discussed in the Fellowship, as well

as her own independent research on other theoretical approaches, and designed a syllabus to

incorporate theory into the curriculum. (Pl. 56.1 Stat. ¶ 6.) Craig also participated in writing the

new curriculum after the Department decided to focus more on theory. (*Id*. ¶ 20.) Craig

introduced evidence that the former Department Chair described Craig as having an

"understanding of the fine balance between theory and technique, which helped Columbia to

develop a complex, multi-disciplined curriculum that was highly instrumental in the success of

the program." (*Id*. ¶ 9.)

Outside of the candidates' views on theory, there is evidence that, despite her

inexperience teaching, the committee felt Potter was a better candidate. First, the tenure-track

position called for a creative artist, and acquisition of an artist who operated at a national level

was considered important to the program's ability to recruit; thus the search committee sought

evidence of the candidates' creative output in national exhibits. (Def. 56.1 Stat. ¶¶ 28–29.)

Potter presented the committee with evidence of national exhibitions; the parties dispute whether

Craig did as well. (*Id*. ¶ 30; Pl. Resp. to Def. 56.1 Stat. ¶ 30.) Second, Citron asserts that her

concern regarding supervision of the papermaking studio and her knowledge of Potter's

experience putting together and supervising a papermaking studio led her to recommend Potter

for the position. (Def. 56.1 Stat. ¶¶ 35, 37.) Abell also testified that he considered Potter to be a

superior artist and paper maker. (*Id*. ¶ 21.) Craig had never overseen a paper studio, though

Craig asserts that she contributed to its management while it lacked a named director. (*Id*. ¶ 36;

Pl. 56.1 Stat. ¶ 8.) Nonetheless, Columbia maintains that Citron did not believe that Craig was

equipped to run the studio. (Def. 56.1 Stat. ¶ 39.) In addition, Craig presents evidence that two people unrelated to the search sent letters to the committee expressing their view that Potter was not qualified for the position; Citron states that she felt one of the letters came from a credible source. (Pl. 56.1 Stat. ¶ 28.)

### ii. Communications between Craig and Citron

As Chair of the Department, Citron was Craig's supervisor. (Def. 56.1 Stat. ¶ 41.) The parties agree that Citron and Craig had trouble communicating. When Citron complained about the style of Craig's emails, Craig explained that she has to send many more emails than the average person, and as a result, her emails are often short and to the point. (Pl. 56.1 Stat. ¶ 19.) Citron asserts that in the Spring of 2008 Craig insisted that an HR representative attend each meeting; Craig states that she only requested a third-party be present when the topic of the meeting was her employment. (Def. 56.1 Stat. ¶ 56; Pl. Resp. to Def. 56.1 Stat. ¶ 56.) Citron further testified that she told Craig to stop by her office periodically to talk and that she was not aware that Craig ever complied with this request. (Def. 56.1 Stat. ¶ 55.) Craig, however, claims that Citron never made that request; instead, a representative of the HR department, who attended a meeting between Craig and Citron at Craig's request, suggested that the two have periodic meetings. (Pl. Resp. to Def. 56.1 Stat. ¶ 55.) The parties also dispute whether Citron was available for "stop-by" meetings or whether she typically required formal appointments. (*Id.*)

Shortly after Potter was offered the position, Citron sent an email to Craig explaining that Craig was highly considered but another candidate had been offered the position; the email also stated that Citron would be happy to meet with Craig for further discussions. (Def. Ex. H (April

6

10, 2008, Email).) Craig responded: "Since it is done, there is nothing to discuss.- - - I was the strongest candidate, with the most experience by far. - - - This is a deliberate, gross injustice, of which you are all fully aware." (*Id*.) After Meador sent another email asking to speak with Craig, Craig responded by sending an email to Meador, Citron, and Abell declining to meet and stating: "Your credibility with me is .0002%, and falling." (Def. Ex. I (April 14, 2008, Email).) Craig continued to decline offers to meet with committee members for about a week following the decision, stating she was upset, believed an injustice had been done, and was not ready to talk about it. (Pl. 56.1 Stat. ¶ 33.) When Citron and Craig did meet, Craig asserts that Citron shouted at her for drawing in meetings; Citron denies this and explains that they had a conversation about Craig drawing during meetings, when she seemingly needed to be looking up to read lips, but that Citron accepted Craig's reasons for doing so[3] and let the topic go. (*Id*. ¶ 34; Def. Resp. to Pl. 56.1 Stat. ¶ 34.) Craig also states that, at this meeting, she was given four reasons why she did not receive the promotion: she drew, she kept a blog, she did not speak up enough at meetings, and she was an inferior paper maker compared to Potter. (Pl. 56.1 Stat. ¶ 34.) Craig explained to Citron that her oral participation in meetings was affected by the fact that she could often not clearly hear what was being said. (*Id*. ¶ 21.) Craig believes that she always followed up on important matters that were discussed in the meetings. (*Id*.)

In September 2008, Craig responded to an email requesting input from faculty members on proposed criteria for the rank of full professors by sending an email to Citron and other department faculty stating: "I have to say that I'm actually offended by being required to attend

---

[3] Craig asserts that she sometimes drew during meetings to "facilitate her thought process," as she has a very visual learning approach due to her hearing loss. (Pl. 56.1 Stat. ¶ 21.)

this discussion. What is the point? I have, as you tenured faculty so eloquently demonstrated you believe, nothing to contribute. And I am uninterested in how you propose to rank yourselves." (Def. 56.1 Stat. ¶ 45.) Craig continued to sporadically send similar emails focusing on the difference between tenured and non-tenured faculty. (*Id.* ¶¶ 46–50.) Craig also sent an email to an HR representative for the school explaining that she was the only non-tenured faculty member remaining from the previous Chair's faculty and that she felt she was going to be fired or phased out of the Department. (*Id.* ¶ 74.)

Craig and Citron met again on April 9, 2009, at which time they discussed a blog authored by Craig. Citron testified that she had read Craig's blog entries that were critical of the school and unprofessional. (*Id.* ¶¶ 52–53.) At one point, Citron asked Craig, "Why are you even here?" to which Craig replied that she did not want to be at Columbia, but needed the job. (*Id.* ¶ 54; Pl Resp. to Def. 56.1 Stat. ¶ 54.) This meeting also involved a discussion about the process of critiquing the students. Craig had previously been allowed to perform her critique in writing, while the other faculty participated in day long oral critiques. The parties dispute whether a solution was reached at this meeting and whether it ended amicably. (Pl. 56.1 Stat. ¶ 37; Def. Resp. to Pl. 56.1 Stat. ¶ 37.) It is undisputed, however, that Citron was permitted to continue writing her critiques through and including her last critique session before her contract expired.

On April 20, 2009, Craig sent an email to the Dean and Vice President of Human Resources voicing concerns about Citron's treatment of her as related to her disability, raising legal issues under the ADA, and asking for assistance on how to proceed. The Dean did not respond directly via email, but discussed the concerns with human resources directly. (Pl. 56.1 Stat. ¶ 39.)

8

Citron testified that by Spring 2009 she felt it was impossible to conduct business with Craig. (Def. 56.1 Stat. ¶ 57.) And at the time she decided not to renew Craig's contract, Citron did not believe that Craig's professionalism had improved. (*Id.* ¶ 60.) Craig's contract was not renewed in May 2009. (Pl. 56.1 Stat. ¶ 39.)[4]

### iii. Accommodations

Craig prefers to communicate via email or face-to-face, but considers email to be the most reliable way to communicate. (Def. 56.1 Stat. ¶ 65.) While other faculty sometimes communicated by telephone, emails and face-to-face interactions were the primary means by which faculty and staff members exchanged information. (Def. 56.1 Stat. ¶ 66.)

Craig asserts that the former Chair of the Department facilitated faculty meetings so that only one person spoke at a time and approved Craig's request to write critiques to students during the semi-annual reviews, instead of participating in the typical oral review process. (Pl. 56.1 Stat. ¶¶ 10–11.) Soon after meeting Citron, Craig disclosed her disability, telling Citron that she needed people to talk one at a time and that she had to read lips. (*Id.* ¶ 15.) The parties dispute whether Citron took steps to ensure that faculty spoke one at a time during faculty meetings, though the parties agree that Citron did not issue a written directive on the topic. (*Id.* ¶ 16; Def. Resp. to Pl. 56.1 Stat. ¶ 16.) Citron did not refer Craig to HR or anyone else at Columbia to facilitate an accommodation, and while they sometimes discussed specific accommodation needs, they did not hold a formal meeting on the subject. (Pl. 56.1 Stat. ¶ 17.)

Craig sometimes used the CapTel system—a system that simultaneously transcribes

---

[4] In various situations after Citron did not renew her contract, Craig referred to the situation as "political." (Def. 56.1 Stat. ¶¶ 62–64.) Craig explains that she used the term "political" as a euphemism for discrimination. (Pl. Resp. to Def. 56.1 Stat. ¶ 63.)

conversations, allowing the words to appears on a screen—to communicate. (Def. 56.1 Stat. ¶ 68.) However, Craig testified that the system only worked sometimes and was "a bad premise to begin with." (*Id.* ¶ 69.) Craig stated that her CapTel phone had been replaced by the State of Illinois on seven different occasions and that she did not want another—according to Craig, the CapTel continually malfunctioned and, when working, was dependent upon captioners who were often inept. (*Id.* ¶ 70.) Craig believed that she would have the same problem with the alternate TTY system. (Pl. Resp. to Def. 56.1 Stat. ¶ 71.) Also, because Craig's hearing impairment increased during her employment, the amplified telephone that once worked "pretty well for a while" became ineffective. (Def. 56.1 Stat. ¶ 72.) While Craig asked Citron to use text message as a means to communicate with her, Citron never sent Craig any texts. (*Id.* ¶ 18.)

While acting as a Thesis Coordinator, Craig had difficulties communicating with the students. This became a problem in one particular instance due largely to an IT glitch that affected the school's email. After this incident, Craig told Citron that it was really difficult for her to be a Thesis Coordinator and that she never wanted to do it again, to which Citron responded by relieving Craig of those duties. (Def. 56.1 Stat. ¶ 79.) Craig blames this outburst on the "extremely stressful incident" and her "high temper;" however, she insists that she did not resign from that position, that she was unaware she was removed from it until a student informed her, and that Citron eventually explained to her that she was removed because she didn't have phone backup. (Def. Ex. B (Dep. of Craig) at 396–98.)

## III. STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

10

issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2515. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See id.*, 477 U.S. at 255, 106 S. Ct. at 2513.

## IV. DISCRIMINATION ANALYSIS

The Americans with Disabilities Act ("ADA") prohibits employers from discriminating "against a qualified individual with a disability because of [her] disability." 42 U.S.C. § 12112(a); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 502 (7th Cir. 2004). While Craig brought this suit under the Rehabilitation Act, it is subject to the same analysis as claims brought under the ADA. *See Ozlowski v. Henderson*, 237 F.3d 837, 842 (7th Cir. 2001). A plaintiff can establish discrimination using the direct or indirect method; as Craig lacks evidence of direct discrimination, she seeks to prove discrimination through the indirect method. Under the burden shifting test introduced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–02, 93 S. Ct.

11

1817, 1824–25 (1973), she must first establish a prima facie case of discrimination by showing that: "(1) [s]he is disabled under the ADA, (2) [s]he was meeting [her] employer's legitimate employment expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees without a disability were treated more favorably." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) (citing *Mobley v. Allstate Inc. Co.*, 531 F.3d 539, 548 (7th Cir. 2008); *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380–81 (7th Cir. 2005)). Once Craig establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citing *Buie*, 366 F.3d at 503). If Columbia succeeds in coming forth with a nondiscriminatory reason, the ultimate burden is with Craig, who must prove that Columbia's proffered reason is mere pretext for discrimination.

## I. Failure to Promote Claim

Craig asserts that she did not receive the tenure-track position because she was discriminated against based on her disability. For this count, Craig has established a prima facie case of discrimination. Columbia does not refute that Craig has a disability within the meaning of the ADA, that she was qualified for the tenure-track position, or that she suffered an adverse employment action when she did not receive the offer. Nor do the parties dispute that Potter, a nondisabled person who received the offer, and Craig are similarly situated. Instead, both parties focus on whether the nondiscriminatory reasons put forth by Columbia—Citron believed Potter would incorporate more theory into the curriculum, and Citron believed that Potter was better suited to run the studio—are pretext for discrimination. We will follow the parties lead and address only whether Craig has brought forth enough evidence such that a reasonable jury could find that she "established by a preponderance of the evidence that the proffered reasons for the

12

alleged discriminatory action are pretextual."[5]  *Radentz v. Marion County*, 640 F.3d 754, 757

(7th Cir. 2011).

"Pretext is a 'lie, specifically a phony reason for some action.'"  *Sublett v. John Wiley &*

*Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (citing *Russell v. Acme-Evans,Co.*, 51 F.3d 64, 68

(7th Cir. 1995)).  In determining whether Columbia's stated reason is pretext, our only concern is

the honesty of the employer's belief.  *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419

(7th Cir. 2006).  "[T]he question in a discrimination case is not whether the employer's stated

nondiscriminatory ground for the action of which the plaintiff is complaining is correct but

whether it is the true ground of the employer's action rather than being a pretext for a decision

based on some other, undisclosed ground."  *Id.* at 417.  Furthermore, it is not our place to second

guess an employer's decision or determine whether the "right" decision was made.  "This is

because courts are not 'superpersonnel department[s]' charged with determining best business

practices."  *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010) (citing *Blise v.*

*Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quotation marks and citations omitted)).

Craig strongly disputes Columbia's first nondiscriminatory reason for choosing Potter:

Craig was not committed to theory.  "With indirect evidence, the plaintiff must show that the

employer's reason is not credible or that the reason is factually baseless."  *Perez v. Illinois*, 488

F.3d 773, 777 (7th Cir. 2007).  Craig first attempts to demonstrate that Citron's belief was

inaccurate by pointing to various situations were she incorporated theory into her teaching and

---

[5] "The prima facie case and pretext inquiries often overlap; we may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision."  *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007) (citing *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998)).

working.  There is in fact some evidence that Craig was amicable to including theory.  However, Craig's assertion that Citron should have known her commitment to theory does not demonstrate that Citron's belief was not honestly held.  Citron could have relied on a number of facts to form her belief that Craig was hostile to theory.  Importantly, there is also unrefuted evidence that Citron felt Potter would incorporate *more* theory into the program.  Among other things, Abell, a member of the search committee, testified that Potter's and Citron's public lectures were in direct contrast on the issue of theory.  Thus there are uncontroverted factual bases on which Citron could have formed such a belief.

Craig next attempts to impugn the credibility of Citron's reason.  She explains that Citron failed to raise this supposed deficiency with Craig before or during the selection process.  While true that neither Citron nor other search committee members raised concerns to Craig about her approach to theory, there is sufficient evidence that Citron specifically raised this concern with others, including the Dean and the committee during the process.  Therefore, failure to raise it with Craig only creates a concern with Citron's management style, it does not establish that Citron was lying about holding that belief.

Finally, Craig asserts that Citron's comments in the post-selection meeting "demonstrate Citron's annoyance with Craig's disability and 'casts doubt' on the hostility-to-theory reason now offered."  (Resp. at 9.)  Craig explains that the meeting contained discussion about Craig drawing and not speaking up during faculty meetings.  Questions of fact remain over the contents of the meeting.  Drawing inferences in favor of Craig, as we must, we assume Citron did admonish Craig for drawing and not speaking during meetings.  While Craig believes this evidence is sufficient to overcome summary judgment, her reliance on *Radentz* is misplaced.

14

*See Radentz*, 604 F.3d at 759. In *Radentz*, the defendant claimed that it was pleased with

plaintiff's work, but had to terminate plaintiff's employment due to the cost of a specific

provision in the contract. The problem, the Court noted, is that the defendant had the power

under the contract to eliminate the costly provision. As a result, the Seventh Circuit found that

the "failure to exercise the right under [the contract] to eliminate troublesome expenses, and to

instead terminate the contract, cast doubt on whether the expense was actually the reason for the

termination." *Id*. The facts here are very different. Citron's dissatisfaction with other aspects

of Craig's performance does not reveal a logical flaw in the defendant's argument such that

Columbia's explanation becomes "nonsensical." *See id*. at 758. Nor does reliance on the

conversation "identify such weaknesses, implausibilities, inconsistencies, or contradictions in

[defendant's] proffered reasons that a reasonable person could find them unworthy of credence

and hence infer that [defendant] did not act for the asserted non-discriminatory reasons."

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Reeves v.*

*Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 (2000); *McCoy v.*

*WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

We turn now to Columbia's second reason for offering the tenure-track position to Potter

instead of Craig: Potter's experience supervising a papermaking studio eclipsed that of Craig.

Craig asserts that because she was selected as a finalist for the position, the committee

presumably felt she would have been capable of running the studio. This argument, however,

misses the point. Columbia does not assert that Craig could not have run the studio, it simply

asserts that the committee felt Potter would do a better job. While Craig points out her

comparative qualifications, "[e]vidence of the applicants' competing qualifications does not

constitute evidence of pretext unless those differences are so favorable to the plaintiff that there

can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly

better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059 (7th Cir.

2006); *Sublett*, 463 F.3d at 738 ("Although evidence showing that the person who was hired was

less qualified than the plaintiff may sometimes suffice to show pretext . . . the difference must be

a significant one."). Columbia explains that Potter had worked at a well respected papermaking

studio and had taught students in the papermaking studio she built and operated. In contrast,

Craig had not directed a papermaking studio. Any difference between the candidates is not

sufficient to demonstrate pretext in this case. It also is not dispositive that the search committee

received a negative reference about Potter, describing her work as "clearly not trained to do the

work [in Serbia] . . . having only dabbled in papermaking." (Resp. at 11.) We do not need to

understand precisely why the committee and the Dean did not rely on this letter. "[T]he question

is never whether the employer was mistaken, . . . or downright irrational in taking the action for

the stated reason." *Forrester*, 453 F.3d at 418. Even with this letter, the committee had

sufficient information on which to form a belief that Potter would be a superior director of the

studio. As such, we will not second guess the committee's determination, and this argument

fails.

Craig also argues that because Citron did not raise supervision or theory concerns during

this meeting, the proffered reason must be of recent origin, and thus a "shifting reason" that

indicates pretext. We find this argument to be factually inaccurate and dismiss it as well.

Columbia concedes that Citron never told Craig that she did not receive the job because of her

lack of experience supervising a papermaking studio. However, the first requirement for the job

16

description referred to supervision of a studio. Potter's experience supervising her own studio was also listed as the first "pro" on the memorandum that the committee sent to the dean. Citron testified that she expressed her concerns about supervision of the studio to the Dean when she made her recommendation, and the Dean similarly testified that Craig's lack of supervision skills was considered a negative. In light of all this evidence, a reasonable jury could not find that Columbia is lying about this proffered reason merely because it was left out of one admittedly heated and confrontational discussion between Citron and Craig. While Craig may be correct that Columbia reached the wrong conclusion, the record does not establish that the committee's beliefs were not honestly held.

Columbia has offered two nondiscriminatory reasons why it did not promote Craig. And Craig has not brought forth sufficient evidence from which a reasonable jury could decide that these reasons are pretext. Therefore, we grant summary judgment on this claim to Columbia.

### ii. Failure to Renew Contract Claim

Craig claims that Citron decided not to renew her contract for discriminatory reasons. Craig seeks to prove this discrimination using the indirect method, and as above, the parties dispute only whether the proffered reason is pretext. Columbia asserts that Citron decided not to renew the contract due to Craig's unprofessional behavior. Specifically, Columbia explains that Citron made the decision after reading Craig's blog entries and finding them offensive, receiving bitter email correspondence from Craig for almost a year after Potter's selection, being told by Craig that a third party must be present during employment discussions, being told by Craig that she did not want to work in the department, and finally learning that Craig had removed her belongings from her office. Based on these observations and interactions, Columbia asserts it

17

was reasonable for Citron to conclude that Craig's contract should not be renewed.

Craig first claims that Citron's reliance on the blog entries is in fact evidence of pretext because the blogs were published in 2007 and since that time she had been considered qualified for the tenure-track position. While the parties debate the meaning of specific entries, we choose not to interpret the metaphors employed by Craig. Instead, we observe that both parties agree that Citron raised the issue of the allegedly offensive blog in a meeting in the Spring of 2009. (Pl. 56.1 Stat. ¶ 37.) There is no evidence of when Citron actually read the blogs. While the timing may be considered an inconsistency in Columbia's proffered reason, it is just one example of Craig's unprofessional behavior. As such, it is not enough such that "a reasonable person could find [the proffered reason] unworthy of credence and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Boumehdi,* 489 F.3d at 792 (citing *Reeves,* 530 U.S. at 143, 120 S. Ct. at 2106; *McCoy*, 957 F.2d at 373)).

Craig also tries to downplay her unprofessional emails—explaining that she only declined "offers" to meet, not "demands," and that "expressions of sadness, even anger, at having been passed over for a position she was led to believe had been created for her were to be expected." (Resp. at 15.) We do not agree that such emails are to be expected, and we cannot find, as Craig asserts, that they are insufficient to justify termination. As the Seventh Circuit explained when clarifying the "insufficient" language, "the question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in taking the action for the stated reason, but simply whether the stated reason *was* his reason: not a good reason, but the true reason." *Forrester*, 433 F.3d at 418 (emphasis in original). The evidence established that Craig did send unprofessional emails to Citron and other faculty. Craig does not

18

provide any reason why we should not believe that Citron truly found these emails unprofessional. Thus we have no reason to believe that this stated reason is a lie.[6]

Finally, Craig again points to the post-selection meeting to establish that Citron targeted Craig for termination because of her disability. The parties agree that Citron started the meeting frustrated that Craig drew during a faculty meeting. Assuming that Citron did raise this subject in an unprofessional manner does not negate the evidence that Craig also acted in an unprofessional manner. Also, to the extent that Citron's accusations were related to Craig's disability—Craig drew during meetings to facilitate her comprehension because her hearing loss made her a visual learner—there is no evidence that Citron made the comments because she was hostile toward those with hearing loss.[7] Rather the evidence indicates that Citron was told that, due to her hearing loss, Craig needed to read lips during the meeting. Citron, maybe incorrectly, assumed that drawing during a meeting prevented Craig from reading lips, and she had a right to discuss that concern. Furthermore, Columbia does not rely on the fact that Craig drew during a meeting as a reason for not renewing her contract, nearly a year later. Thus even if we credit Craig's description of the events, it does nothing to demonstrate that the proffered reasons are unworthy of credence or that Citron did not honestly believe them.

The remainder of Craig's arguments explain that Citron could have done more to facilitate her relationship with Craig. To the extent that these concerns focus on accommodating

---

[6] To the extent that Craig relies on Columbia's treatment of Abell after he was passed over for a position, Craig fails to demonstrate the she and Abell were similarly situated. In fact, Abell is a tenured faculty member, so any discipline for unprofessional conduct would necessarily be different.

[7] In fact, there is evidence that Citron suffered from hearing loss.

Craig's disability, we address them below. Otherwise, we are again guided by the Seventh Circuit's ruling that an employer can be mistaken or irrational in its decision; we do not judge whether the reason was a good reason, but whether it was the true reason. *See Forrester*, 453. F.3d at 418.

Craig cannot demonstrate that Columbia's stated reason was not the honest reason for its action. We therefore grant Columbia's motion for summary judgment on the termination claim.

## V. FAILURE TO ACCOMMODATE CLAIM

The Rehabilitation Act incorporates the prohibitions contained within the ADA that require employers like Columbia to offer "reasonable accommodations" to "qualified individuals with a disability." 42 U.S.C. § 12112(b)(5)(A) (2006); *see also Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996). "[F]ailure to make reasonable accommodations for a known disability constitutes unlawful discrimination." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (citing 42 U.S.C. §§ 12112(b)(5)(A), 12112(a)). To establish her failure to accommodate claim, Craig must show that: "(1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability." *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 678 (7th Cir. 2010) (citing *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).

Craig alleges that Columbia failed to accommodate her in various situations; all of the assertions are without merit. First, Craig cannot base her accommodation claim on Columbia's failure to provide additional telephone assistance. Craig admits that the systems made available by Illinois were not effective in her situation; she also acknowledges that the majority of the Department's communications were conducted via email or face-to-face. Importantly, Craig has

20

not suggested any related accommodation that would increase her ability to enjoy equal employment opportunities. *Mays v. Principi,* 301 F.3d 866, 870 (7th Cir. 2002) ("The plaintiff cannot seek a judicial remedy for the employer's failure to accommodate her disability without showing that a reasonable accommodation existed."). Second, she cannot base her claim on being removed from the Thesis Coordinator role. There is unrefuted evidence that Craig asked not to be a Thesis Coordinator because, due to her inability to use the telephone, the experience was too frustrating for her. Relieving her of this duty is more akin to providing an accommodation than removing one, even if Craig later changed her mind and decided she wanted to try again. *See Emerson v. Northern States Power Co.,* 256 F.3d 506, 515 (7th Cir. 2001) ("[T]he employee is not entitled to her preferred accommodation." (citing *Gile*, 95 F.3d at 499 )). Third, Craig cannot base her claim on Citron's request for a copy of the written critiques. Citron did not remove the accommodation already provided to Craig whereby she would write the student critiques rather than participate in an oral presentation, and Craig does not allege that Citron's request to receive a copy of the written critiques substantially reduced the accommodation. As Columbia points out, the faculty felt that an oral critique was beneficial because it allowed everyone to hear the feedback, thus requiring Craig to provide a copy of her report does not put her in a materially different position than other teachers.

Craig, in a last effort to prove a failure to accommodate, alleges that "Citron's refusal to engage in an interactive process, or to involve HR in doing so, and her failure to make such simple accommodations as directing faculty to speak one at a time in meetings, contributed directly to Craig's inability to meet Citron's demands regarding 'speaking up.'" (Resp. at 19.) There is no dispute that Citron failed to effectively conduct meetings such that Craig would be

21

able to participate. There is also no dispute that better management of the meetings would have helped Craig to participate. Columbia attempts to rely on its assertion that Craig spent her time drawing during faculty meetings, preventing her from seeing faces and reading lips. Thus, they argue, requiring participants to speak one at a time would be useless, as Craig would still not be able to participate. However, Craig informed Citron in Spring 2008 that she doodled during meetings, not to tune out the speakers, but to facilitate her learning. According to Citron's own testimony, she accepted this explanation. (Pl. 56.1 Stat. ¶ 34; Def. Resp. to Pl. 56.1 Stat. ¶ 34.) Therefore, Columbia cannot now rely on Craig's drawing as a reason for not accommodating her. *See Sears, Roebuck & Co.*, 417 F.3d at 804 ("[A]n employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark.").

Nonetheless, Craig's claim fails. As her complaint explains, "it is unlawful to deny a reasonable accommodation to an employee that would enable the employee to perform the essential functions of the job." (Compl. ¶ 46.) *See also* 29 C.F.R. § 1630.2(o)(ii) (defining "reasonable accommodation" as "Modifications or adjustments to the work environment . . . that enable a qualified individual with a disability to perform the essential functions of that position.") Yet, Craig never alleges that speaking up at meetings is an essential function of the job. Rather the parties agree that she was performing the essential functions of her job,[8] and

---

[8] In other parts of her pleadings, Craig in fact stresses that she was performing all essential functions of the job, despite any trouble she had in meetings. (*See e.g.*, Resp. at 3 ("[Citron] did not direct faculty to speak one at a time in meetings . . . Nevertheless, Craig was a highly successful member of the Department."); Pl. 56.1 Stat. ¶ 21 ("Craig did not fail to follow up on any important matters that were discussed in meetings."); *Id.* ¶ 4 ("Craig was nominated for and received numerous awards," some after Citron became chair.).)

Craig was released for reasons unrelated to her ability to speak up during faculty meetings. Therefore, as the management of faculty meetings did not affect Craig's ability to perform an essential function, requesting a change is not a request for a "reasonable accommodation" under the law. Furthermore, because Craig had no difficulty performing the essential functions of her position, Columbia had no obligation to engage in an interactive process about the issue. *Mays*, 301 F.3d at 870–71 ("The purpose of the consultative process is to find a reasonable accommodation for the particular disabled employee.").

To the extent that Craig alleges a general failure to engage in the interactive process, rather than simply failure to discuss Citron's management of meetings, we similarly find that her argument is without merit. The facts are clear that the parties discussed Craig's use of emails, her responsibilities as a Thesis Coordinator, and her use of written critiques. As discussed above, Columbia acted within the law when responding to each of these concerns. Craig does not raise any other "reasonable accommodations" that would have been necessary for her to perform the essential functions of her job, nor does she allege that she could not perform the essential functions of the job without additional accommodations. This alone requires us to rule in Columbia's favor. Furthermore, to succeed on a reasonable accommodations claim, Craig must show "not only her attempt to engage in an interactive communication process with [Columbia] to determine a reasonable accommodation, but also that [Columbia] was responsible for any breakdown that occurred in that process." *Ekstrand v. School Dist. of Somerset*, 583 F.3d 972, 975–76 (7th Cir. 2009) (citing *Sears, Roebuck & Co.*, 417 F.3d at 797). Craig has not brought forward evidence sufficient to support either of these demands. As such, no reasonable jury could find that Columbia failed to engage in the required interactive process. We grant summary

judgment to Columbia on this issue.

## VI. CONCLUSION.

For the reasons stated above, we grant the motion for summary judgment. It is so

ordered.

Honorable Marvin E. Aspen
U.S. District Court Judge

Dated: February 15, 2012